UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
━━━━━━━━━━━━━━━━━━━━━━━━━━━━

MONICA SZLEKOVICS,

        Petitioner,

      -v-                          07-CV-6443(MAT)
                                        **ORDER**
BRIAN FISCHER, Commissioner,
New York State Department of
Correctional Services; and
ADA PEREZ, Superintendent,
Bedford Hills Correctional Facility,

        Respondents.
━━━━━━━━━━━━━━━━━━━━━━━━━━━━

## I.   Introduction

Petitioner Monica Szlekovics ("petitioner") who is represented by counsel, has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging her convictions in Monroe County Court of Murder in the Second Degree, Kidnapping in the First Degree, Kidnapping in the Second Degree, Burglary in the First Degree, and Assault in the First Degree. Following a jury trial before Judge John J. Connell, petitioner was sentenced to an aggregate term of imprisonment of fifty years to life.

## II.  Factual Background and Procedural History

### A.   The Crimes

During the autumn months of 1996, petitioner and her estranged husband Angel Mateo ("Mateo") engaged in series of violent crimes involving kidnappings, assaults, burglaries, and one murder in the City of Rochester. The crime spree was apparently

part of Mateo's plan to reunite with Mateo's girlfriend, Cindia Sanchez ("Sanchez"), who had fled their abusive relationship. The convictions stem from three separate but related incidents.

On October 11, 1996, petitioner and Mateo held hostage, terrorized, and threatened to kill Maria Sanchez, Jose Roman, and their four-year old daughter in their Avenue D apartment in the City of Rochester in an attempt to locate Sanchez, Maria Sanchez's sister. T. 262-83, 303-04, 314-28, 354, 431.[1]

Less than a month later, petitioner, Mateo, and Mateo's half-brother Victor Cordero ("Cordero") abducted a 20-year old mentally ill man named Juan Matos ("Matos") believing Matos might be able to lead them to Sanchez. When Matos proved not to be helpful, the three took him to Mateo's home, covered his eyes with a bandana, and shot him in the head. They covered Matos' head with a plastic bag and left him to die in Mateo's basement. A few hours after the shooting, the three then wrapped the body and dumped it in a lot on Sherer Street in Rochester. Both petitioner and Mateo gave conflicting accounts as to who actually shot Matos. T. 286, 359-69, 367, 418-19, 772, 865, 1189, 1207-10.[2]

---

[1] Citations to "T.__" refer to the trial transcript..

[2] It is unclear, and could not be established from the physical evidence, who exactly shot Juan Matos. Petitioner first told officers that Mateo pulled the trigger. Later, after being questioned further by police, she acknowledged responsibility for the shooting in her signed statement, but claimed that it was at Mateo's command. Mateo, on the other hand, confessed to shooting Matos, and testified to the same at his trial, and also made statements implicating petitioner in the shooting. See People v. Mateo, 2 N.Y.3d 383, 369-97 (2004).

On November 6, 1996, petitioner, Mateo, and Cordero returned to Maria Sanchez's apartment on Avenue D in hopes that her sister would appear. After waiting several hours in the basement, the three decided to take over the first floor apartment, which was occupied by Willie McWilliams ("McWilliams"), his girlfriend, and his young son. The three entered the apartment with guns and handcuffs. Mateo then attempted, unsuccessfully, to cut McWilliams' throat. Although McWilliams was severely injured and had been shot[3] during his struggle with Mateo, he ultimately survived and testified about the incident at petitioner's trial. T. 560-85, 759-60, 777-79.

Petitioner was charged with Murder in the First Degree (N.Y. Penal Law ("P.L.") §§ 20.00, 125.27(1)(a)(vii)), Attempted Murder in the First Degree (P.L. §§ 20.00, 110.00, 125.27(1)(a)(vii), Murder in the Second Degree (P.L. §§ 20.00, 125.25(3)), Kidnapping in the First Degree (P.L. §§ 20.00, 135.25(3)), four counts of Kidnapping in the Second Degree (P.L. §§ 20.00, 135.20), two counts of Burglary in First Degree (P.L. §§ 20.00, 140.30(2),(3)) and three counts of Assault in the First Degree (P.L. §§ 20.00, 120.10(1), (4)).

---

[3] Again, it is unclear who shot McWilliams. Petitioner testified that during the altercation she fired shots in the direction of McWilliams and Mateo, but was uncertain who was hit. She then went out to the porch of the house and turned the gun on herself. McWilliams, who had at that point broken free from Mateo, intervened so petitioner would not shoot herself. T. 1508-1513.

**B.   The Trial**

Because Mateo and petitioner gave statements implicating each other, their trials were severed. Petitioner's Reply Memorandum ("Pet'r Mem.") at 18. At petitioner's trial, the prosecution framed their case against her as an accomplice and also with her own independent criminal intent. The prosecution presented evidence that, although petitioner was married to Mateo, Mateo had an intimate relationship with Cindia Sanchez. While Mateo and Sanchez were dating, petitioner frequently accosted Sanchez, at one point spraying mace at her and slashing Mateo's car tires while his vehicle was parked at Sanchez's home. T. 407-10, 429, 438.  The relationship between Mateo and Sanchez quickly dissolved, however, as a result of Mateo's abuse towards Sanchez and her children. Sanchez subsequently sought refuge at a battered women's shelter to escape Mateo. T. 410-13, 430.

Not long after, according to petitioner,  Mateo was arrested on an unspecified, unrelated offense. He suspected it was petitioner who had informed on him and threatened her with a gun. When petitioner denied having gone to the police, Mateo concluded that it must have been Sanchez who "snitched" and resolved to kill her. T. 1187-88, 1219. It is unclear, however, what Mateo's true objective was in seeking out Sanchez. Nonetheless, the pair ultimately left a bloody trail in Mateo's quest to reach her. The prosecution sought to prove that petitioner was not only involved,

but actively participated in each of the crimes, including the murder of Juan Matos.

**C.  Petitioner's Defense**

At trial, petitioner's attorney pursued the affirmative defense of duress, arguing that, because of Mateo's constant violence and abuse toward petitioner, she engaged in the criminal acts for fear of her life.  Petitioner knew Mateo had killed before and believed he would not hesitate to do so again. Her addiction to heroin further impeded her ability to flee from Mateo.

Petitioner married Angel Mateo in 1995, two years after the two first met and shortly after Mateo's release from prison.  From the inception of their relationship, Mateo was mentally and physically abusive to petitioner, and the abuse became more frequent after the two were married. Two months after the marriage, petitioner separated from Mateo because of his abuse and his "on and off" affair with Janette Sanchez. Petitioner maintained that she sought a divorce, but was not able to obtain one because Mateo refused to cooperate, wanting to maintain a measure of control over her.  Despite this, petitioner repeatedly accompanied Mateo in his numerous attempts of searching for Sanchez, because she felt that she "had to."  Petitioner continued to use heroin during this time. T. 1292-96, 1312-29.

With respect to the crimes, petitioner acknowledged her presence, but denied shooting Matos; denied threatening Jose Ramos

and his family; and she denied attempting to kill McWilliams. The
defense sought to minimize her level of participation and that she
did not share the mental culpability of Mateo. To that end,
petitioner testified to every episode of abuse at the hands of
Mateo and presented a picture of a drug-addicted and fear-driven
woman. She did, however, admit that she carried guns and handcuffs
to assist Mateo in his various plans. After Matos was killed,
petitioner wrapped his body in a blanket and helped dispose of the
body behind a factory. Afterward, she cleaned the blood from the
basement floor in response to Mateo's instructions. T. 1320-29,
1353-57, 1361-68.

The jury was charged by the trial court on the affirmative
defense of duress. Petitioner was acquitted of the intentional
murder of Matos, but convicted of his kidnapping and felony murder
based on her role in that crime. She was also convicted for the
abductions at the Avenue D residence, and the burglary and assault
perpetrated against McWilliams. She was acquitted of the attempted
murder of McWilliams.

###    D.    Appeal and Post-Conviction Relief

Through counsel, petitioner filed a brief to the Appellate
Division, Fourth Department, which unanimously affirmed the
judgment of conviction. People v. Szlekovics, 19 A.D.3d 1036 (4th
Dept. 2005); lv. denied, 5 N.Y.3d 810 (2006).

Petitioner then filed a motion to vacate the judgment of conviction pursuant to N.Y. Crim. Proc. Law ("C.P.L.") § 440.10 in Monroe County Court on March 6, 2007. See Respondent's Appendix ("Appx.") Vol. II at M, N. That motion was denied on the merits, and leave to appeal that decision was denied by the Appellate Division. Appx. Vol. II at P, T.

In September of 2007, petitioner filed the instant petition for habeas corpus, raising the following grounds for relief: (1) ineffective assistance of trial counsel; (2) the inconsistent theories of petitioner's culpability presented at her trial and at the separate trial of her co-defendant violated her due process rights; (3) the jury was not properly instructed on the affirmative defense of duress; (4) the prosecution improperly impeached petitioner; and (5) cumulative error should result in a new trial and sentencing. See Amended Petition ("Am. Pet.") 32-69, Pet'r Mem. 1-23 (Dkt. ##7, 17). Petitioner has also filed a motion to expedite the decision granting the instant petition or, in the alternative, to grant the petitioner a Sparman hearing[4] to secure testimony from her trial counsel with respect to her claim of ineffective assistance of counsel. (Dkt. ## 18, 19). For the

---

[4] Before a habeas court issues a writ of habeas on the basis that trial or appellate counsel rendered constitutionally defective performance, the generally preferred course of action is to hold an evidentiary hearing to allow an allegedly ineffective attorney an opportunity to be heard and to present evidence. Sparman v. Edwards, 154. F.3d 51, 52 (2d Cir. 1998) (per curiam); see also Jackson v. Leonardo, 162 F.3d 81, 86 (2d Cir. 1998) (where the circuit court finds a Strickland violation, "the usual practice should be to remand ... to the district court to permit the attorney in question to testify and explain her actions").

reasons that follow, a <u>Sparman</u> hearing is not warranted and the petitioner is not entitled to habeas relief.

## III. Discussion

### A.   General Principles Applicable to Federal Habeas Review

#### 1.   Standard of Review

To prevail under 28 U.S.C. § 2254, as amended in 1996, a petitioner seeking federal review of his conviction must demonstrate that the state court's adjudication of his federal constitutional claim resulted in a decision that was contrary to or involved an unreasonable application of clearly established Supreme Court precedent, or resulted in a decision that was based on an unreasonable factual determination in light of the evidence presented in state court.  <u>See</u> 28 U.S.C. § 2254(d)(1),(2); <u>Williams v. Taylor</u>, 529 U.S. 362, 375-76 (2000).

#### 2.   Exhaustion Requirement and Procedural Default

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . ." 28 U.S.C. § 2254(b)(1)(A); <u>see</u>, <u>e.g.</u>, <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 843-44 (1999); <u>accord, e.g.</u>, <u>Bossett v. Walker</u>, 41 F.3d 825, 828 (2d Cir.1994), <u>cert. denied</u>, 514 U.S. 1054 (1995). "The exhaustion requirement is not satisfied unless the federal claim has been 'fairly presented' to the state courts." <u>Daye v. Attorney General</u>,

696 F.2d 186, 191 (2d Cir. 1982) (en banc), cert. denied, 464 U.S. 1048 (1984).

However, "[f]or exhaustion purposes, 'a federal habeas court need not require that a federal claim be presented to a state if it is clear that the state court would hold the claim procedurally barred.'" Grey v. Hoke, 933 F.2d 117, 120 (2d Cir. 1991) (quoting Harris v. Reed, 489 U.S. 255, 263 n.9 (1989); other citations omitted). Under such circumstances, a habeas petitioner "no longer has 'remedies available in the courts of the State' within the meaning of 28 U.S.C. Section 2254(b)." Grey, 933 F.2d at 120. The procedural bar that gives rise to the finding that the claim should be deemed exhausted works a forfeiture and precludes litigation of the merits of the claim absent a showing of cause for the procedural default and prejudice resulting therefrom or by demonstrating that failure to consider the claim will result in a fundamental miscarriage of justice. See Wainwright v. Sykes, 433 U.S. 72, 87-91 (1977).

**B.   Merits of the Petition**

**1.   Ineffective Assistance of Trial Counsel**

Petitioner claims that she is entitled to habeas relief on that basis that her trial counsel was constitutionally ineffective. Am. Pet. 32-47; Pet'r Mem. 3-16. Specifically, petitioner argues that counsel failed to interview several witnesses, including witnesses that testified at Mateo's subsequent trial, whose

testimony would have corroborated petitioner's duress defense. Am. Pet. 42-45. This omission, according to petitioner, effectively deprived petitioner of what should have been a successful defense.

The Monroe County Court rejected this claim on the merits in a Memorandum and Order dated March 6, 2007, finding that trial counsel's conduct was not deficient under <u>Strickland v. Washington</u> and denied a hearing on the matter. Appx. Vol. II, P.

The respondent has argued, in sum and substance, that the various witnesses whom petitioner's counsel failed to call would not have supported her defense of duress or simply would not have been relevant, and thus defense counsel's strategy was not objectively unreasonable. Respondent's ("Resp't Mem.") 23-35. After reviewing all of petitioner's submissions and the entire state court record, the Court agrees that the County Court's determination was not contrary to, or an unreasonable application of Supreme Court precedent.

### a.   <u>Strickland v. Washington</u>

To establish that she was deprived of his Sixth Amendment right to the effective assistance of trial counsel, a habeas petitioner must show that (1) her attorney's performance was deficient, and that (2) this deficient performance prejudiced her defense. <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984). Deficiency is measured by an objective standard of reasonableness, and prejudice is demonstrated by a showing of a "reasonable

probability" that, but for counsel's unprofessional errors, the result of the trial would have been different. Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding." Id. To succeed, a petitioner challenging counsel's representation must overcome a "strong presumption that [his attorney's] conduct falls within the wide range of reasonable professional assistance." Id. at 689. A reviewing court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct," id., and may not second-guess defense counsel's strategy. Id. at 690.

The Supreme Court has made clear that "[c]ounsel has a duty to make reasonable investigations or to make reasonable decisions that makes particular investigations unnecessary." Id. at 690-91. However, the Second Circuit has repeatedly noted its reluctance to "second guess matters of trial strategy simply because the chosen strategy was not successful." Trapnell v. United States, 725 F.2d 149, 155 (2d Cir. 1983). Strickland itself is instructive that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. A reviewing court must "indulge a strong presumption that counsel's conduct falls within the wide

range of reasonable professional assistance." <u>Id.</u>   Finally, the
Second Circuit has held that the decision not to call a particular
witness is typically a question of trial strategy that [reviewing]
courts are ill-suited to second-guess." <u>Greiner v. Wells</u>, 417 F.3d
305, 323 (2d Cir. 2005) (internal quotation marks omitted). Here,
petitioner has failed to demonstrate that her counsel's conduct was
deficient within the meaning of <u>Strickland</u>, and that, but for the
deficiency, the result of her trial would likely have been
different.

### b.   Petitioner's Defense

Because petitioner conceded that she was present at each
charged criminal act, and her level of participation varied, and
because she signed written confessions to that end, a defense of
duress was apparently the strongest defense available to her.[5]   In
New York, a criminal defendant asserting the affirmative defense of
duress must prove that "the defendant engaged in the proscribed
conduct because he was coerced to do so by the use of threatened
imminent use of unlawful physical force upon him or a third person,
which force or threatened force a person of reasonable firmness in
his situation would have been unable to resist." P.L. § 40.00(1).

---

[5] In May, 1997, defense counsel filed a notice pursuant to C.P.L. §
250.10, indicating that petitioner intended to offer psychiatric evidence at
trial concerning her drug addiction, withdrawal, treatment for drug abuse,
past psychiatric treatment, and history of spousal abuse and potential
evidence of battered woman's syndrome. Am. Pet. 16. After the close of the
prosecution's proof, however, petitioner withdrew her notice to present
psychiatric evidence. T. 1337-38.

New York case law requires that the force or threat must be imminent. <u>People v. Thompson</u>, 34 A.D.3d 325 (1st Dept. 2006); <u>People v. Staffieri</u>, 251 A.D.2d 998 (4th Dept. 1998).

Assuming petitioner's allegations that counsel did not contact and interview several potential witnesses[6] are true, petitioner cannot meet the burden enunciated by <u>Strickland</u>. Even if those witnesses would have provided accounts of the abuse by Mateo before the crime spree began, that testimony would likely not have strengthened petitioner's duress defense, which required that the crimes be committed under present, immediate harm.[7]

The trial court and counsel were aware of petitioner's history of abuse at the hands of Mateo. At trial, defense counsel consistently attempted to corroborate her denials of criminal conduct in his cross-examination of the prosecution's witnesses. The driving force behind the defense was petitioner's own testimony that conveyed her fear of Mateo, who was, by all accounts,

---

[6] Petitioner names seven witnesses whose testimony would have supported her defense. For example, she suggests that employees at the battered women's shelter could have testified that petitioner sought refuge after a serious beating by Mateo later in 1995. Pet'r Mem. at 10-11. Petitioner testified to that event at trial and the prosecutor did not challenge the testimony. T. 1307, 1597. She similarly suggests that Sanchez, the subject of Mateo's pursuit, could have provided character testimony about Mateo's reputation for violence. Am. Pet. 37. Sanchez did, however, testify concerning Mateo's violent behavior on cross-examination. T. 429-446.

[7] The specific instances of abuse to which the women's shelter employees and the treating physician at Park Ridge Hospital would have testified, took place months to a year before the crimes occurred. <u>See</u> Pet'r Exhibits at 14; Appx. Vol. III at 1, ¶ 48-49, 66-67. Although prior threats and assaults may support a claim of duress at the time of the crime, the prior instances must be coupled with a "present and immediate compulsion." <u>Staffieri</u>, 251 A.D.2d at 998-999.

controlling, violent, and threatening towards petitioner and others. The prosecution did not challenge this element of her defense. Therefore, the additional testimony would have served only to bolster petitioner's testimony regarding Mateo's abuse prior to the commission of the crimes.[8]

Moreover, the facts as admitted by petitioner at trial indicate that she had several opportunities to remove herself from the crime spree, but did not. <u>See</u> P.L. § 40.00(2) (precluding a defense of duress where person intentionally or recklessly subjects herself to the situation). Petitioner had numerous opportunities to escape from Mateo, including her entry into rehabilitation programs for drug addiction and periods of time spent at the shelter for battered women. Thus, even if the potential witnesses were interviewed and called, it is unlikely that petitioner's conviction would have been substantially undermined.

---

[8] Petitioner relies on <u>Justice v. Hoke</u>, 90 F.3d 43, 48-50 (2d Cir. 1996), to support her contention that evidence which corroborates a witness' testimony is critical in demonstrating the veracity of that testimony. In <u>Justice</u>, the issue presented before the Court was whether the trial court's exclusion of testimony violated petitioner's right to present a defense. In evaluating that claim, the Second Circuit examined whether "'the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.'" <u>Justice</u>, 90 F.3d at 47. (citing <u>United States v. Agurs</u>, 427 U.S. 97, 112 (1976)). Petitioner's case is clearly distinguishable from <u>Justice</u>, wherein the Second Circuit found that the excluded testimony could have raised a reasonable doubt that did not otherwise exist because it would have challenged the sole prosecution witness' version of the facts and corroborated the petitioner's testimony. Here, petitioner's testimony regarding Mateo's violent tendencies and menacing behavior was not in dispute; petitioner's testimony regarding that fact went unchallenged by the prosecution throughout petitioner's direct examination. It is therefore difficult to argue that any additional testimony relating to Mateo's abuse of petitioner would have "rendered the verdict questionable," <u>id.</u> at 48, given the strength of the prosecution's case against petitioner.

I also disagree with petitioner's assertion that those witnesses' testimony would be "potentially exculpatory." Pet'r Mem. 15. There is nothing in the record to indicate that any of the individuals named would have provided testimony that would have exculpated petitioner; indeed, nothing of an exculpatory nature was alleged in any of petitioner's submissions to this Court or in her C.P.L. § 440 papers.

The prosecution presented a strong case against petitioner. In light of those circumstances, counsel's choice to pursue a defense of duress and implement a particular trial strategy--allowing the petitioner to recount years of abuse, laboring under constant threats from Mateo, and her inability to make choices due to a debilitating heroin addiction--cannot be said to be outside the realm of professionally competent assistance. Strickland, 466 U.S. at 689; see also Schulz v. Marshall, 528 F.Supp.2d 77, 100 (E.D.N.Y. 2007) ("Where the Second Circuit has found insufficient prejudice, the evidence against defendants was very strong, and counsel's error (or purported error) minor in comparison.")

Finally, the Court observes that counsel's strategy was, in part, successful. Petitioner was acquitted of the first degree murder and attempted first-degree murder charges against her with respect to victims Juan Matos and Willie McWilliams. Therefore petitioner cannot overcome the strong presumption that her attorney rendered effective assistance. See United States v. Cronic, 466

U.S. 648 (1984). Even assuming that her attorney's conduct was deficient, which I do not find, she has not established that her defense of duress would have been successful had counsel interviewed and called the potential witnesses listed in her habeas petition and thus cannot meet the "prejudice" requirement under <u>Strickland</u>.

In sum, petitioner has not established that counsel's performance was constitutionally ineffective. Accordingly, the Monroe County Court did not render a decision that was contrary to or an unreasonable application of Supreme Court precedent. <u>Williams</u>, 529 U.S. at 375-76. This claim is dismissed.

### c. <u>Sparman</u> Motion

For the above-stated reasons, petitioner's request for a <u>Sparman</u> hearing is denied because petitioner has failed to show that her attorney's representation was fundamentally defective. <u>See</u> <u>Jolaoso v. United States</u>, 142 F.Supp.2d 306, 308 n. 2 (E.D.N.Y. 2001) ("the requirement of inviting a response from counsel does not apply to every one of the voluminous number of claims of ineffective assistance of counsel that come before a district judge, but only to those sufficiently serious that there is a real possibility that the claim may be upheld"); <u>see also</u> <u>Rodriguez v. People of the State of New York</u>, No. 01 Cv. 9374, 2002 WL 31251007, at *2 n. 2 (S.D.N.Y. Oct. 8, 2002).

## 2.   Fair Trial Claims

### a.   Inconsistent Theories Presented at Co-Defendant's Trial

Petitioner argues that she is entitled to a new trial because the prosecutor argued irreconcilably inconsistent theories of petitioner's culpability at her trial and that of her husband/co-defendant, Angel Mateo. Am. Pet. 47-55. Specifically, she contends the prosecutor challenged petitioner's duress defense at her trial, yet "offered evidence that Petitioner had acted under duress" at Mateo's trial to prove that Mateo commanded petitioner to kill Matos.[9] Pet'r Mem. 18; see People v. Mateo, 2 N.Y.3d 383 (2004).

Like petitioner, Mateo confessed to Matos's killing, but equivocated as to whether he or she pulled the trigger. Ultimately, however, the jury acquitted petitioner of the relevant count. Charged under alternate theories in a subsequent prosecution, Mateo was found guilty for Mato's murder, but the question of whether he was the shooter or the commander was never resolved. People v. Mateo, 2 N.Y.3d 383 (2004). The Appellate Division decided this issue on the merits:

> Contrary to the further contention of defendant, she was not deprived of her right to a fair trial on the ground that the

---

[9]   To clarify, at petitioner's trial, the prosecution argued that petitioner acted on her own accord and as an accomplice with regard to all of the crimes, including the murder of Juan Matos. At Mateo's subsequent trial, the prosecutor argued alternatively that either Mateo killed Matos, or that petitioner killed Matos under the command of Mateo. According to petitioner, the prosecutor, in arguing Mateo's guilt under the "commander" theory of culpability at Mateo's trial, simultaneously argued that petitioner acted under duress in carrying out the shooting, even though he attacked petitioner's duress defense at her trial a year prior. Pet'r Mem. 18.

> prosecutor's theories advanced at her trial
> and that of her codefendant allegedly were
> irreconcilably inconsistent. The Court of
> Appeals previously rejected the identical
> contention of the codefendant on his appeal.
> Here, as in Mateo, the prosecutor's actions
> did not breach defendant's right to a fair
> trial.

People v. Szlekovics, 19 A.D.3d 1036, 1037 (4th Dept. 2005) (citations and quotations omitted).

Petitioner has argued that the Appellate Division's determination unreasonably applied and was contrary to Supreme Court precedent. The cases upon which she relies, however, are not directly on point. See Brady v. Maryland, 373 U.S. 83, 87 (1963) (suppression by the prosecution of material evidence favorable to the accused violates due process); Berger v. United States, 295 U.S. 78, 88 (1935) (prosecutor shall not use improper methods calculated to produce a wrongful conviction); Napue v. Illinois, 360 U.S. 264, 269 (1969) (prosecutor may not knowingly present false testimony).  Although these authorities encompass a broad range of due process violations, none of them enunciate the standard which petitioner argues was unreasonably applied by the state court.  Indeed, "[t]he Supreme Court has never held that the prosecution's presentation of inconsistent theories in separate prosecutions arising out of the same incident violates the due process clause." Brooks v. Graham, No. 06 Civ. 5418(BMC), 2007 WL 2344871, *2 (E.D.N.Y. Aug. 16, 2007).

Other Circuits have concluded that, under AEDPA review, a state court's finding of no due process violation in presenting inconsistent theories of prosecution was not contrary to clearly established federal law where no Supreme Court precedent established such a principle. See Fotopoulos v. Secretary, Dept. of Corr., 516 F.3d 1229 (11th Cir. 2008); Blalock v. Wilson, 320 Fed.Appx.396, 417-18 (6th Cir. 2009) (unpublished opinion); see also Bradshaw v. Stumpf, 545 U.S. 175, 187 (2005) (declining to decide whether a prosecutor's inconsistent positions in two cases amounted to a due process violation). I therefore find that the Appellate Division's claim was not contrary to or an unreasonable application of Supreme Court law.

Furthermore, examined against the holdings of Brady, Berger, and Napue, the record does not support petitioner's argument that the positions taken by the prosecutor amounted to prosecutorial misconduct. Indeed, the prosecutor's theories were not inherently inconsistent, as found by the Mateo court. At both the Mateo trial and petitioner's trial, the prosecution presented evidence of each co-defendant's self-incriminating statements regarding the murder of Juan Matos, and statements that implicated each other. The record also reveals that evidence was introduced at petitioner's trial that she made statements to police that she killed Matos after Mateo gave her the gun and told her to shoot him in the

head.[10]   Similarly, the evidence at Mateo's trial supported his
vacillating admissions that he intended to execute the victim and
did so himself, and also that he commanded petitioner to do the
shooting. See Mateo, 2 N.Y.3d at 401-404.

At petitioner's trial the prosecutor emphasized that Mateo was
the driving force behind the crimes, but that petitioner was
nonetheless capable of exercising free will and accompanied Mateo
voluntarily on his crime spree, maintaining at both trials that
both actors were culpable.  Moreover, because both actors could
have been found guilty of First Degree Murder for the killing of
Matos, the prosecution's theory did not differ in any significant
way.  See Penal L. § 125.27(1)(a)(vii); compare Thompson v.
Calderon, 120 F.3d 1045 (9th Cir. 1997)(en banc)(plurality op.),
rev'd on other grounds 523 U.S. 538 (1998). It is true that the
evidence was presented somewhat differently at each trial. See
Ngyuen v. Lindsey, 232 F.3d 1236, 1240 (9th Cir. 2000) ("Any lawyer
who has ever tried a case knows that trial preparation is not a
static process.").  That does not mean that the prosecutor used
false evidence or acted in bad faith.  Only the petitioner and
Mateo knew who actually shot Matos, so the prosecution could not
know who the shooter was and thus could not have knowingly

---

[10] Petitioner later testified that she only confessed to killing Matos
because she thought that Mateo would try to hurt her and her family and that,
after hours of interrogation by police, "it didn't matter to me if I had went
away to jail for the rest of my life." T. 1394-1408.

presented false information to the jury in presenting its evidence in both cases. See Mateo, 2 N.Y.3d at 402.

For the foregoing reasons, I find the Appellate Division's decision did not run afoul of clearly established federal law, and this claim is dismissed.

### b.    Improper Jury Instruction on Duress

Petitioner next claims that she is entitled to habeas relief because the trial court did not properly instruct the jury on the affirmative defense of duress[11]. Am. Pet. 56-57.    Her primary argument is that the instruction failed to convey the appropriate legal standard to the jury to apply in its consideration of the affirmative defense of duress. Id. at 57.

The jury charge reads, in pertinent part:

> The people have the burden of establishing the guilt of the Defendant beyond a reasonable doubt. If you find they have done that, the Defendant thereafter had the affirmative defense to prove the defense of duress by credible evidence by a fair preponderance of the evidence. It places the burden to prove the defense upon Ms. Szlekovics to prove the affirmative defense of duress by a preponderance of the credible evidence in this case. . . . When you are satisfied that the evidence from whatever source derived *supports the Defendant's contention that she committed the crime because of duress outweighs and is more convincing than any evidence from any source that the Defendant did not commit the*

---

[11] The affirmative defense of duress required petitioner to establish, by a preponderance of the evidence, that she engaged in the criminal acts because she was coerced to do so by the use or threatened use of physical force that a reasonable person in her circumstances would be unable to resist. P.L. § 40.00.

> *crime because of duress,* and in considering
> evidence . . . it's not the number of
> witnesses or the length of their testimony
> which you should consider, but, instead, the
> quality of the evidence and the convincing
> effect that the evidence has on your mind
> concerning this issue.

T. 1732-33 (emphasis added). The Appellate Division reviewed this
contention on appeal and rejected it on the merits. Szlekovics, 19
A.D.3d at 1037.

The Second Circuit has consistently held that, "[i]n order to
obtain a writ of habeas corpus in federal court on the ground of
error in a state court's instructions to the jury on matters of
state law, the petitioner must show not only that the instruction
misstated state law but also that the error violated a right
guaranteed to him by federal law." Davis v. Strack, 270 F.3d 111
(2d Cir. 2001) (citing Casillas v. Scully, 769 F.2d 60, 63 (2d Cir.
1985)). In addition, in reviewing a claim that a jury charge is
erroneous, the Court must review the jury instructions as a whole.
"[A] challenged portion of the jury instructions 'may not be judged
in artificial isolation,' but rather must be judged as the jury
understood it, as part of the whole instruction, and indeed, as
part of all the proceedings that were observed by the jury."
Chalmers v. Mitchell, 73 F.3d 1262, 1267 (2d Cir. 1996) (quoting
Cupp v. Naughten, 414 U.S. 141, 147 (1973)). The review "must ...
establish[ ] not merely that the instruction is undesirable,
erroneous, or even 'universally condemned,' but that it violated

some right which was guaranteed to the defendant by the Fourteenth Amendment." Cupp, 414 U.S. at 146. The trial court has broad discretion to determine under what circumstances and how the charge should be given. United States v. Civelli, 883 F.2d 191, 195 (2d Cir. 1989).

Here, petitioner concedes that the trial court's instructions were modeled after the Criminal Jury Instructions. Pet'r Mem. at 21. See CJI2d[NY] Defenses–Duress; P.L. § 40.00. Rather, she asserts that no reasonable jury could have understood what the burden of preponderance of the evidence was as charged by the trial court. Am. Pet. 57, Pet'r Mem. 21. Notably, petitioner did not object to that portion of instruction at the time, nor did she object when the jury requested the trial court to re-read the entire instruction on duress. T. 1753-1757. Moreover, the Appellate Division did not find error in the instruction as a matter of state law. Even if the instruction were confusing, the question in such a collateral proceeding is "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" Henderson v. Kibbe, 431 U.S. 145, 154 (1977) (quoting Cupp, 414 U.S. at 147); see also Middleton v. McNeil, 541 U.S. 433, 437 (explaining that "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation").

Preponderance of the evidence is properly defined as evidence "of such convincing quality that it outweighs any proof to the contrary." <u>See</u> CJI2d[NY] Defenses-Duress. The trial court did not misstate the law, <u>see</u> <u>People v. Zito</u>, 299 A.D.2d 569 (2d Dept. 2002), and petitioner's argument that "no reasonable jury could have understood" the instruction is purely speculative. When read as a whole, the charge conveyed the correct legal standard. <u>Zito</u>, 299 A.D.2d at 570. Because there was no error of state law, I find no due process violation occurred as a result of the jury charge in question.

Accordingly, the Appellate Division's resolution of this claim was not contrary to, or an unreasonable application of Supreme Court precedent.

### c.   Improper Cross-Examination by Prosecution

Petitioner next contends that the statements she made to a psychiatric expert were improperly used by the prosecutor during her cross-examination. Am. Pet. 59-65. The Appellate Division rejected her claim of evidentiary error on the merits. <u>Szlekovics</u>, 19 A.D.3d at 1037.

The respondent has argued that the instant claim is unexhausted and procedurally defaulted. Resp't Mem. 47-48. Notably, petitioner does not refute this in her reply memorandum. Pet'r Mem. 22-23. I find that petitioner has not properly exhausted the claim

in the state courts, and therefore the claim is procedurally defaulted.

On direct appeal, petitioner framed her inadmissible evidence argument solely in state law terms, citing the relevant section of the New York Criminal Procedure Law and New York case law. <u>See</u> C.P.L. § 60.55 (limiting the admissibility of a defendant's statements made during pre-trial examination on the issue of whether defendant lacks responsibility by reason of mental disease or defect). Petitioner did not present this argument to the Appellate Division using any of the four methods[12] enumerated by <u>Daye v. Atty. Gen. of the State of N.Y.</u>, 696 F.2d 186, 194 (2d Cir. 1982). Rather, petitioner made one passing reference to her "right to equal protection and to present a defense," in her eight-page argument, but did not elaborate on those points nor did she refer to any precedent to support a constitutional argument arising from the facts presented. <u>See</u> Pet'r Appellate Br. at 33. Consequently, I do not find that the Appellate Division was sufficiently alerted to the nature petitioner's constitutional claim.

Although petitioner's claim is unexhausted, it should be deemed exhausted because state remedies are no longer available to

---

[12] "In summary, the ways in which a state defendant may fairly present to the state courts the constitutional nature of his claim, even without citing chapter and verse of the Constitution, include (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." <u>Daye</u>, 696 F.2d at 194.

her. See Jimenez v. Walker, 458 F.3d 130, 149 (2d Cir. 2006). Petitioner has taken her one direct appeal and she cannot again seek leave to appeal this claim in the New York Court of Appeals because she has already made the one request for leave to which she is entitled. See N.Y. Court Rules § 500.20. Collateral review of this claim is also barred because it could have been raised on direct appeal but was not. C.P.L. § 440.10(2)(c). Her claim is therefore procedurally defaulted absent a showing of cause for the procedural default and prejudice resulting therefrom. Wainwright, 433 U.S. at 87-91. Petitioner makes no such showing, and therefore this claim is dismissed.

### d.  Cumulative Error

As a final claim for habeas relief, petitioner argues that the cumulative effect of the errors in her case deprived her of a fair trial. Am. Pet. 67; Pet'r Mem. 23. Petitioner raises her claim of "cumulative error" for the first time in the instant petition. Although the claim itself is technically unexhausted, the Court has evaluated all of petitioner's claims herein and finds them to lack merit. See generally Jimenez v. Walker, 458 F.3d 130 (2d Cir. 2006) (holding claim of cumulative error was procedurally barred where habeas petitioner failed to fairly present claim to the state courts); see, e.g., Lambrix v. Singletary, 520 U.S. 518, 525 (1997)("We do not mean to suggest that the procedural-bar issue must invariably be resolved first; only that it ordinarily should

be. Judicial economy might counsel giving the [underlying issue] priority, for example, if it were easily resolvable against the habeas petitioner . . . ."); 28 U.S.C. § 2254(b)(2).

The alleged errors presented by petitioner, taken singly or cumulatively, did not "produce[ ] a trial setting that was fundamentally unfair, thereby depriving him of his constitutional right to due process." Jimenez, 458 F.3d at 148 (citing Taylor v. Kentucky, 436 U.S. 478, 487 n. 15 (1978)). Moreover, in all of the alleged infirmities in the trial court's rulings and conduct, this Court has not discerned any colorable errors–a finding which is fatal to petitioner's claim. See United States v. Yousef, 327 F.3d 56, 161 (2d Cir.) ("[Co-defendant] argues that the cumulative effect of all the District Court's trial errors denied him his right to a fair trial. We have recognized such claims. However, because we have concluded that there were no trial errors . . . much less cumulative errors, this claim fails.") (internal citation omitted), cert. denied, 540 U .S. 933 (2003). Accordingly, this claim is denied.

**IV. Conclusion**

For the reasons stated above, Monica Szlekovics' petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the action is dismissed.  Because petitioner has failed to make a "substantial showing of a denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of

appealability.  See, e.g., Lucidore v. New York State Div. of Parole, 209 F.3d 107, 111-113 (2d Cir. 2000).  The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person.  Coppedge v. United States, 369 U.S. 438 (1962).

        **SO ORDERED.**

                                        S/Michael A. Telesca

                          _____
                                        MICHAEL A. TELESCA
                                   United States District Judge

Dated:      May 5, 2010
            Rochester, New York